**In re Lee E. LEVA, Debtor.**

**Bankruptcy No. 88–52430C.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Feb. 19, 1989.

Lawrence A. Beck, Beck & Beck, P.C., San Antonio, Tex., for debtor.

John Patrick Lowe, Uvalde, Tex., trustee.

## DECISION SUSTAINING TRUSTEE'S OBJECTIONS TO DEBTOR'S EXEMPTIONS

LEIF M. CLARK, Bankruptcy Judge.

The Trustee, John Patrick Lowe, objects on three grounds to the debtor's claim of exemption in certain items of personal property under the Texas Property Code. He contends that:

(1) the debtor's claim of exemption of certain jewelry pieces does not satisfy the requirements of Texas law for jewelry to be exempt;

(2) the debtor's relationship with his girlfriend and her son does not entitle him to the $30,000 ceiling for personal property given to a "family unit" instead of the $15,000 for a single adult; and

(3) the debtor's exemption claim to the insurance proceeds for a lost portable phone and lost hand-held recorder does not fall within the exemption category for tools and equipment used in a trade or profession.

After presentation and conclusion by both sides of legal argument, I took this matter under advisement. A few weeks before, the Fifth Circuit had remanded an unrelated, but legally dispositive, case concerning the jewelry issue, originally decided by this court. *Matter of Fernandez*, 855 F.2d 218 (5th Cir.1988). The District Court in turn remanded the case back to this court, with instructions to follow the

directives of the circuit.[1] The Fifth Circuit has directed that I initiate the development of a test to use in future cases concerning the jewelry exemption. To some extent, I am aided in this task by the groundwork laid by my brethren, Judge Larry E. Kelly, of the Austin division of this district, and Judge Harold C. Abramson, of the Northern District of Texas. *In re Peters*, 91 B.R. 401 (Bankr.W.D.Tex.1988), *In re Reed*, 89 B.R. 603 (Bankr.N.D.Tex.1988).

## I. JEWELRY EXEMPT AS CLOTHING

The debtor seeks to exempt a diamond ring, a gold bracelet, and a Rolex watch under the Texas personal property exemption for clothing. Tex.Prop.Code § 42.002(3)(C).

The alchemistic task of transforming jewelry into clothing is imposed on this court by the Fifth Circuit's conclusion that jewelry may be "clothing" under Texas law for exemption purposes. *Fernandez* clearly mandates that: (1) not all jewelry qualifies under the clothing exemption; (2) to qualify as clothing, the jewelry must be "worn by the owner"; (3) "it would be inappropriate to claim an exemption for jewelry held by the debtor for investment or resale purposes"; and (4) the jewelry must be "reasonably necessary for the family or single adult." *Id.* at 221–22.

*Fernandez* emphasized the importance of fleshing out the standard, especially the "reasonably necessary" prong. The Fifth Circuit cited a bankruptcy court's ruling as an example of the kinds of issues a court might look at. *In re Tyler*, 2 B.C.D. 1537 (Bankr.N.D.Tex.1976). That decision opined that:

> [F]actors which are important in determining whether the claimed exemption is reasonably necessary are the station in life of the person claiming the exemption; the feasibility of wearing it in day to day activity; its value; and the circumstances under which it was acquired including

---

1. The remand reversed my previous decision (as well as the affirmance of that decision by the District Court, *see In re Fernandez*, 89 B.R. 601 (W.D.Tex.1988)) that the change in wording from "wearing apparel" to "clothing" overruled prior Texas case law which classified jewelry as "wearing apparel." *Matter of Fernandez*, 855 F.2d 218, 220 (5th Cir.1988).

the financial condition of the debtor at the time. There are others, the list does not purport to be exhaustive.

*Id.* at 1538. The Fifth Circuit warned however that it did not necessarily approve of these factors, but "merely used them to illustrate the types of questions a court might address in deciding whether jewelry claimed by a debtor meets the reasonable necessity test." *Fernandez,* 855 F.2d at 222, n. 24.

I am also assisted by the panoply of canons of statutory construction. In construing a statute, I may legitimately consider, among other things, the following:

(1) the object sought to be attained;

(2) the circumstances under which the statute was enacted;

(3) legislative history;

(4) common law or former statutory provisions, including laws on the same or similar subjects;

(5) the consequences of a particular construction;

(6) administrative construction of the statute; and

(7) title (caption), preamble, and emergency provisions.

Texas Code Construction Act, Tex. Gov't Code. Ann. § 311.023 (Vernon 1988).

Of particular assistance is the case law construing other Texas exemptions. As a general proposition, Texas law mandates that provisions of the Texas Constitution and Texas statutes which relate to the same subject matter should be construed together, consistently, harmoniously, uniformly, and in light of each other. *Purcell v. Linsey,* 158 Tex. 541, 314 S.W.2d 283 (1958); *Kaufman County Levee Imp. Dist. v. National Life Ins. Co.,* 171 S.W.2d 188, 189 (Tex.Civ.App.—Dallas 1943, writ ref'd); *Duncan v. Gabler,* 147 Tex. 229, 215 S.W. 2d 155 (1948); *Railroad Commission v. St. Louis Southwestern Ry. Co.,* 443 S.W.2d 71, 74 (Tex.Civ.App.—Austin 1969, writ ref'd n.r.e.); *Yeary v. Bond,* 384 S.W.2d 376, 379 (Tex.Civ.App.—Amarillo 1964, writ ref'd n.r.e.); *Howard v. State,* 704 S.W.2d 575, 578 (Tex.App.—Beaumont 1986, no writ); *Willaby v. State,* 698 S.W.2d 473,

477 (Tex.App.—Fort Worth 1985, no writ); *Flax v. Potts,* 204 F.Supp 458 (N.D.Tex. 1962), *aff'd,* 313 F.2d 284 (5th Cir.1963); *Carr v. Hunt,* 651 S.W.2d 875 (Tex.App.— Dallas 1983, writ ref'd n.r.e.). Additionally, although not controlling, other states' case law construing similar exemptions also illuminates the inquiry. *Sportatorium, Inc. v. State,* 115 S.W.2d 483, 489 (Tex.Civ.App.—Dallas 1938, writ dism'd); *In re Estates of Carrigan,* 517 S.W.2d 817, 818–819 (Tex.Civ.App.—Tyler 1974, no writ).

Guided by these authorities, I now explore factors a court ought to use in applying the clothing exemption to particular jewelry items. In deference to the principle of judicial restraint and acknowledging the continuing vital character judicial precedent, this list does not purport to be exhaustive.

## DEBTOR'S USE AND INTENT TO USE JEWELRY AS CLOTHING

### ("A Rolling Gem Stone Gathers No Debt")

Writing on a nearly clean slate, as it were, I begin by examining case law which relates to the same basic subject matter, exemptions. Texas has a well-developed body of case law on homestead exemptions and an equally well-developed test that proves to be instructive. To establish a homestead exemption, a debtor must prove (1) actual use as homestead, and (2) intent to use the property as a homestead. *Ellisor v. Ellisor,* 630 S.W.2d 746 (Tex.App.— Houston [1 Dist.] 1982, no writ); *Braden Steel Corp. v. McClure,* 603 S.W.2d 288 (Tex.Civ.App.–Amarillo 1980, no writ); *Prince v. North State Bank of Amarillo,* 484 S.W.2d 405 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.). These elements focus on the debtor's relationship with the property. They are useful aids in the jewelry area as well. It is not a particular jewelry item itself which suggests its exempt character but rather something in the relationship of the debtor to the jewelry item in question. *Fernandez* suggests an approach reminiscent of that used in homestead exemption analysis, requiring a show-

ing that the jewelry item is actually used as clothing and disqualifying jewelry "held by the debtor for investment or resale purposes," i.e., held for a purpose other than as clothing. *Matter of Fernandez*, 855 F.2d at 222. As a general proposition, then, this court holds that, as in homestead analysis, in jewelry as well the debtor must establish that (1) the jewelry item in question is in fact used as clothing and (2) the debtor's intent with respect to the jewelry is an intent to use it in an "exempt manner" as clothing, as opposed to, for example, an investment intent. Now my task is to hang flesh on these bare bones.

It is safe to say that the first major element, that of use as clothing, is the *sine qua non*. If the jewelry is never worn, it cannot be exempt. This follows from its classification (by case law) as "clothing." If it is not worn, it cannot be clothing and so should not enjoy exemption. *See Matter of Fernandez*, 855 F.2d at 220–21. In a sense, all jewelry by its very nature is intended to be worn. *See* e.g., Levey & Greenhall, Concise Columbia Encyclopedia (Columbia University Press 1983) ("personal adornments worn for ornament, to show rank or wealth, or to follow custom"). Texans must do more than rely on dictionarial "sleight of word," however. Only jewelry which is *in fact* worn is exempt:

> If worn by the owner, it was a constituent part of his attire, and in our judgment is within what the Legislature meant to include by the term 'wearing apparel.' [Otherwise] a sheriff with an execution could remove the pendants from a lady's ears, or a badge from the veteran's coat.

*First Nat. Bank v. Robinson*, 124 S.W. 177, 179 (Tex.Civ.App.1909).

But for how long or when must the debtor wear the jewelry? The court in *Reed* concluded that it "would find exempt from execution by creditors only that jewelry which is worn by the debtor on a continuing basis." *In re Reed*, 89 B.R. at 607. A "continuing basis" is not synonymous with "continually." The court in *Reed* was merely seeking to avoid exempting jewelry which is "never worn or perhaps worn only on rare occasions." *Id.* at 607. The court easily found jewelry that was worn on a daily basis to be exempt. A Texas court allowed a debtor (albeit a deceased one) to exempt rings, even though the debtor (presumably in his lifetime),

> did not wear the rings continuously but 'at times' pledged them as security for loans and 'at other times' had them in a file at home or in his bank box ... [To hold otherwise would allow a debtor to exempt a shirt as clothing only] while on his back but not while reposing in a dresser drawer.

*Hickman v. Hickman*, 149 Tex. 439, 234 S.W.2d 410, 414. *Hickman* recognizes that most debtors regularly consign their jewelry to a jewelry box, safety deposit box, the top of a dresser or night stand, or some other place, whether for convenience or for safety. It is simply not practical to condition the jewelry exemption on a showing of literally continuous wear, as that is not how jewelry is normally used. Infrequency of wear, however, may indicate a failure under the second element, intent to use. We turn then to intent.

Even if jewelry is in fact worn (even worn continuously), it should not be assured of exemption. *Fernandez* held that debtors should be denied the benefit of the exemption if they "hold" the jewelry for investment. The bankruptcy court in *Reed* echoed this sentiment:

> Today, jewelry is frequently purchased as an investment, never to be worn or perhaps worn only on rare occasions. These items could hardly come within the plain meaning of the word "clothing."

*In Re Reed*, 89 B.R. at 607. This sentiment is also reflected in the Uniform Exemptions Act which would allow jewelry to be exempted only if it is "held for the personal use of the individual or a dependent." 13 Uniform Laws Annotated, § 8(b) at p. 228 (1986). The few relevant decisions in other jurisdictions evince an equivalent antipathy towards an investment purpose. *See In re Leech*, 171 F. 622, 626 (6th Cir.1909) (determining factor was whether the jewelry pieces were "acquired and used as ornamental apparel, or were acquired and kept

as an investment of values, as a matter of business, rather than for the purpose of ornament"); *In Re Goldberg,* 59 B.R. 201, 208 (Bankr.N.D.Okla.1986) (denied debtor the exemption for jewelry held as investment).

If, then, a debtor "holds" jewelry for any investment purpose whatsoever, is that debtor automatically disqualified from claiming the exemption? As more fully examined under the "Ornamental or Luxurious" and "Market Value" sections, *infra,* jewelry by its nature tends to be an expensive luxury. We purchase and give jewelry, at least partially, because it is valuable and may be an investment. Those of us at one end of the economic spectrum generally insure our jewelry from loss or theft. Pawn shops line their display cases, windows and shelves with used jewelry, mute testimony to its "investment value" at the other end of the economic spectrum. The market value of jewelry fluctuates with that of gold, silver and precious stones. To totally divorce jewelry from its investment value is to allow exemption only for cheap trinkets that would not interest creditors in any event.[2] I do not believe, therefore, that the Fifth Circuit meant that the disclosure of literally any investment intent would be fatal to the exemption. Rather, an investment intent may be present but may not predominate. The jewelry may be exempt so long as the principle purpose in the acquisition and retention of the jewelry is one properly within the purview of the exemption.

What, then, are the indicia of a proper purpose or intent? To what extent can a debtor's use of his Rolex both as an adornment and as an investment co-exist without threatening the exempt nature of the jewel-

ry piece? In seeking to develop a workable test for the jewelry exemption, I propose a series of variables, suggested by the statute's limitation that only clothing which is "reasonably necessary" may be exempt. Tex.Prop.Code, § 42.002(3)(C).

Exemptions represent a statement of public policy regarding what the citizens of this state believe all persons are entitled to retain, no matter how much they might owe to their creditors. *See* Tex. Const., Art. XVI, § 49, Interpretive Commentary (Vernon 1955).[3] Some exemptions are preserved primarily because they truly are necessary to the very survival of the family as an independent economic unit not on the public dole. Others, such as jewelry, are allowed not so much to assure mere survival as to assure survival with a modicum of dignity. These items are more likely to reflect the cultural and social mores of the state in which they are preserved as exempt.[4] We prevent their confiscation to preserve that sense of dignity to which we believe our citizens are entitled, no matter how much money they owe their creditors. It is a fundamental precept of the exemption laws of this state that a court must ever safeguard a debtor's dignity from the ravages of creditor collection. In *Cobbs. v. Coleman,* 14 Tex. 594 (1855), the Texas Supreme Court vowed:

> [n]o Creditor shall strip from the sacred body of the wife of your bosom, from the tender form of the precious child she bore you, or from your own frame, the clothing you have purchased with your earnings to hide your nakedness and that of your beloved dependents. This unnecessary humiliation shall never be visited upon you, with the consent of the law.

2. Indeed, people buy the house they live in with an eye to its potential for appreciation, yet that does not thereby mean that they do not intend the property as their homestead.

3. States the interpretive commentary,
For the purpose of protecting debtors from destitution, or their families from deprivation of support, or the public from the danger of their becoming charges, the constitution provides that the legislature shall have the duty of enacting statutes which stipulate that certain personal property of debtors shall not be liable to seizure and sale under legal process

> for the payment of their debts.... The purpose underlying exemption legislation is securing to the unfortunate debtor the means to support himself and his family, the protection of the family being the main consideration. *Id.*

4. Residents of this state may claim, by way of example, items such as two firearms, a pickup truck, a horse (with saddle and bridle), five cows and a breeding bull. Tex.Prop.Code, § 42.001.

*Id.* Another court echoed this sentiment and warned, with a touch of hyperbole, that

> to hold otherwise is to demand of the freeman that he go out in public, to fill his place in society and earn a living for himself and his own, exposed to the ridicule of his fellowman and subjected to the cold arm of the law because of indecent exposure in a public place; and his wife and children must find someplace of seclusion, or be forced to similarly suffer.

*Cities Service Oil Co. v. North River Ins. Co.,* 82 S.W.2d 184, 187 (Tex.Civ.App.— Fort Worth 1935), *rev'd on other grounds,* 107 S.W.2d 994 (1937).[5]

The creation of exemptions always requires a balancing of the perceived need to preserve a debtor's survival and a debtor's dignity against the need to protect the interests of creditors, betraying the inherent tension between affording a debtor a fresh start and a head start. *Matter of Fernandez,* 855 F.2d at 221. The Texas personal property exemptions are buffered in three ways which reflect this balancing. First of all, Texas places a cap on the total fair market value of personal property one can retain. Tex.Prop.Code, § 42.001(a), (b) ($30,000 for families, $15,000 for single adults). Second, a given item of personalty must fall within one of the specified categories of exempt property. Tex.Prop.Code, § 42.002. Finally, within some categories, a debtor is further restricted to keeping items only to the extent they are reasonably necessary.

The clothing category under which jewelry is subsumed is one of a number of exemption categories narrowed by the reasonably necessary limitation. Also limited are farming and ranching implements, the two firearms otherwise permitted, athletic and sporting equipment, and the tools, equipment, books, and apparatus used in a trade or profession. The entire clothing category is subject to this limitation, so that a Texan (at least a south Texan), for example, could have difficulty hanging on to not just the diamond necklace around her neck but the fur coat under which it hangs as well. Asking whether an item of personalty is "reasonably necessary" is really asking whether it falls within the ill-defined penumbra of protective concern which finds its expression in Texas exemption laws. Is the item needed for survival or to preserve the dignity of the debtor? At the same time, the question serves to weed out those items the retention of which offends our more puritanical sensibilities.[6] *Fernandez,* for example, tells us that a dominant investment purpose either in the acquiring or in the holding of jewelry, will place the item outside the protective aura of the public policy evinced by the exemption. By the same token, we know that the wedding ring and the "badge on the veteran's coat" fall well within that penumbra. *First Nat. Bank v. Robinson,* 124 S.W. at 179. The variables a court must examine in applying the "reasonably necessary" limitation must somehow reflect this state's commonly held values and mores, as they are expressed through judicial pronouncements and legislative enactments, in order to ferret out the reach of that penumbra of protective concern which exemption laws are supposed to outline.

This is not, I hope, a trek into aimless relativism. Courts will nonetheless be left to conduct a highly fact-specific inquiry first of all into whether the quantum of use and intent is sufficient to qualify the items as clothing, and second of all, into whether

---

5. Texas does not stand alone in its steadfast protection of a debtor's dignity. For example, Bankruptcy Judge Tom Small, of the Eastern District of North Carolina, cautioned that to "require a debtor ... to relinquish a wedding ring or engagement ring would not only be contrary to prior North Carolina practice, it would also be contrary to one of the traditional purposes of exemption law—the preservation of the debtor's dignity." *In re Mims,* 49 B.R. 283, 287 (Bankr.E.D.N.C.1985).

6. An article in a recent issue of the *Texas Monthly* magazine, for example, in reviewing recent major bankruptcies amongst Texas' rich and famous, found particularly offensive the extent of valuable property these rich Texans could retain while nonetheless being allowed to walk away from their debts.

the debtor's relationship with the jewelry items falls within the "penumbra of protective concern" generally demarcated by the limitation that the jewelry in question be "reasonably necessary." Hopefully, the following elucidation of variables will prove useful to the task laid before us by the Fifth Circuit.

## DEBTOR'S DIGNITY AND EMOTIONAL ATTACHMENT

("The Way To A Debtor's Heart Is Through His Or Her Jewelry," or "The Importance of Wearing Your Heart On Your Sleeve or on Some Other Part of Your Clothing")

I noted above Texas' overweening concern for preservation of a debtor's dignity. *See (Cobbs. v. Coleman,* 14 Tex. 594 (1855); *Cities Service Oil Co. v. North River Ins. Co.,* 82 S.W.2d 184, 187 (Tex.Civ.App.—Fort Worth 1935), *rev'd on other grounds,* 107 S.W.2d 994 (1937)). For a debtor's dignity to be imperiled by the loss of the jewelry piece to the collection process, the item must usually have some sentimental value to its owner. The court in *In re Reed, supra,* suggested that exemption analysis "should include consideration of such things as whether the item is of sentimental value to the debtor or whether the item serves some worthy purpose such as keeping time." *In re Reed,* 89 B.R. at 607; *see In Re Westhem,* 642 F.2d 1139, 1139–1140 (9th Cir.1981) (highlighting the sentimental value a debtor attached to an engagement ring in holding the ring exempt). A Minnesota court noted that a major purpose of exemptions is to secure "to debtors free from creditors' claims items of personal and sentimental value." *Fullerton Lumber Co. v. Carstens,* 248 Minn. 254, 80 N.W.2d 1 (1956). The Uniform Exemptions Act (adopted by Alaska) exempts "family portraits and heirlooms of particular senti-

mental value to the individual." 13 Uniform Laws Annotated, § 8(a)(3).[7]

How to measure sentimental attachment? With respect to some items, such as wedding rings, that attachment is well-nigh presumed under the mores of this state (as in most states). For other items, the court will have to inquire into the peculiarities of the debtor's life history that have injected sentimental value into cold gold. It is safe to say that a debtor must have first formed this attachment to the jewelry long before the bankruptcy filing. Generally, the longer one has owned and worn an item, the stronger the emotional attachment, though mere length of possession should not be dispositive. A court should also look at how the jewelry was acquired. Jewelry bought or given to commemorate seminal events in the human cultural experience enjoyed by the rich and non-rich alike, may deserve the protection of the exemption. However, sentiment must be measured by objective criteria, lest every debtor suddenly develop a sentimental attachment triggered more by the bankruptcy filing than by any pre-petition life events. As the court in *Reed* explained:

> Keeping in mind the liberality with which the Texas exemption statutes are to be construed, the Court should ask whether an objective reasonable person would find the jewelry necessary to the debtor or his family.

*In Re Reed,* 89 B.R. at 607.[8]

## JEWELRY USED AS A LUXURY OR ORNAMENT

("Diamonds are a Debtor's Best Friends," or "Jewelry for Jewelry's Sake")

The Debtor has cited *Stephenson v. Wixom* for the proposition that "luxury" items must by definition qualify for exemption under the clothing category. In *Stephen-*

---

7. The heirloom exemption in the Texas exemption statute is expressly included under the category of "home furnishings," suggesting it is not available for the inclusion of items of jewelry, though perhaps it would pick up your grandmother's tea service. Tex.Prop.Code, § 42.002(1); *see Alsup v. Jordan,* 69 Tex. 300, 6

S.W. 831 (1888) (terms "household" and "furniture" should be given their ordinary signification).

8. "Necessary" as used here clearly means "necessary to preserve the debtor's dignity or that of the members of her family."

*son*, a debtor sought to exempt a motor vehicle as a "camper truck" under the applicable Texas exemption. Tex.Prop.Code, § 42.002(4)(G). The court rejected the argument that

> the purpose of the exemption statute is to protect only utilitarian vehicles and the exemption statute should not protect .. [a] 'luxury vehicle.' ... A similar argument was rejected by the Supreme Court which held that diamond rings could be exempt property under the class of 'wearing apparel.' (citing *Hickman, supra*) We find that ... the vehicle was designed to be used as a recreational vehicle and because of its intended purpose, we hold that it is a camper truck, exempt from execution.

*Stephenson v. Wixom*, 727 S.W 2d 747, 750 (Tex.App.—Fort Worth 1987, no writ).[9]

*Stephenson* does suggest that as long as personal property is used for its "intended purpose" it is exempt notwithstanding its luxurious character. The debtor argues, by illogical extension, that because jewelry by its nature is a luxury, it is by definition serving its intended purpose and must therefore always be exempt. The argument overlooks the statutory limitation that the jewelry be "reasonably necessary." It can be safely concluded that a luxury, by its nature, is not "necessary." Following this syllogism to its inevitable conclusion, jewelry would never be reasonably necessary, and so would never be exempt. As attractively elegant as this argument is to this, the same court that concluded that jewelry might be wearing apparel but not clothing, the Fifth Circuit has closed off that avenue in *Matter of Fernandez, supra*. I am instead constrained to seek the happy, if elusive, medium between these poles.

It is impossible to divorce jewelry from its luxurious characteristics. It is, after all, intended to ornament, to adorn. Further, Texas courts have usually not found these characteristics to be fatal to other exemptions. For instance, in construing the Texas exemption for "the family library, and all family portraits and pictures" the court in *Alsup v. Jordan*, 69 Tex. 300, 6 S.W. 831 (Tex.1888) pronounced that the exemption

> will embrace the entire collection of books belonging to the family, without reference to whether they are such as convey information necessary in the ordinary affairs of life or such as merely minister to the pleasure or amusement of the family or some of its members. It also exempts 'one carriage or buggy,' which is convenient, but not necessary, in every family.

*Alsup v. Jordan*, 6 S.W. at 833. Using this rationale, the court thus deemed a piano to be household furniture, notwithstanding its ornamental, as opposed to utilitarian, character.

The court in (*Cities Service Oil Co. v. North Rivers Ins. Co.*, 82 S.W.2d 184 (Tex. Civ.App.—Fort Worth 1935), *rev'd on other grounds*, 107 S.W.2d 994 (1937)) colorfully analyzed the liberal treatment given in the case law to Texas exemptions:

> These courts have held that a dray is a "wagon," a diamond ring is "wearing apparel," an automobile is a "carriage," a piano is "household furniture", that with the exempted horse there is included a "bridle and saddle," "shoes" upon the horse's feet, and a "rope" about his neck. And these decisions rest in part upon the fact that they are necessary for the beneficial enjoyment of the property exempted by actual designation. An unbroken colt is held to be a "horse," and the lowly mule, so useful and so seldom ornamental, the butt of the jester, who spoke contemptuously of him as being "without pride of ancestry or hope of posterity," is held to be a horse.

*Cities Service Oil Co. v. North Rivers Ins. Co.* 82 S.W.2d at 186 (citations omitted). *See also Cobbs v. Coleman*, 14 Tex. 594 (1855) (exemptions must include not only the subject itself, but everything essential

---

**9.** The Debtor also cites to *In re Evans,* 25 B.R. 105 (Bankr.N.D.Tex.1982) which allowed a debtor to exempt a Rolex watch. However, that court provided no guidance for its decision and it is quite unlikely that the *Evans* court meant to fashion a *de facto* exemption for Rolex watches (f/k/a, "Texas Timex's").

to its beneficial enjoyment); *see generally In re Peters*, 91 B.R. 401 (Bankr.W.D.Tex. 1988).[10] The court in *In re Richards*, 64 F.Supp. 923, 927 (S.D.Tex.1946), citing favorably to the rationale in *Cities Services*, allowed a debtor to exempt a diamond ring as "wearing apparel" even though the court conceded that the ring was not, strictly speaking, "necessary" to the debtor, but was instead merely convenient and ornamental.

It is indeed inappropriate for a court to disallow a jewelry piece from exemption simply because it is ornamental or because it can be categorized as a luxury. The court in *Reed* explained that the jewelry exemption "should not be limited to that which is indispensable, but should include things which are *usual and appropriate* for the reasonable comfort and convenience of the debtor." *In Re Reed*, 89 B.R. at 607 (emphasis added).[11]

By the same token, of course, the fact that an item is ornamental or luxurious cannot render it exempt by definition. To the contrary, the extent to which it is luxurious may indicate the debtor's resale or investment intent, and tend to undermine the debtor's intent to use the piece in manner more consistent with purposes deemed protected as a matter of public policy.

## MARKET VALUE

("All that Glitters May Not Be Gold, But It's Probably Expensive" or "The Best Things In Texas Aren't Free")

In *In Re Smith*, 96 F. 832 (W.D.Tex. 1899), a district court held that a diamond stud qualified under Texas' exemption for "wearing apparel." The court noted in passing that

> [n]o objection can be made on the ground of value, because the statute imposes no limitation as to value; ... The statute is satisfied if the debtor has acted in good faith, and has applied the article claimed to be exempt to its proper and legitimate use as wearing apparel, and no inquiry will be made as to its value or appropriateness.

*Id.* at 835. This approach is the essence of sensibility. Texas already caps the value of the personal property which a debtor may exempt, $30,000 for a family and $15,000 for a single adult. Tex.Prop.Code, § 42.001(a). It is foolish to superimpose by judicial gloss an additional dollar cap on each item of exempt personalty. Agreed the bankruptcy court in *Reed*,

> This Court specifically declines to state whether the value of the jewelry should be considered in this analysis. Of course, if the item was of such value that it would exceed, or cause the Debtor's total personal property claimed as exempt to exceed the $15,000/$30,000 limit, it would not be exempt in any case.

*In Re Reed*, 89 B.R. at 607, n. 2.

Market forces will resolve most valuation issues below the cap anyway. Creditors will only be interested in items whose value exceeds the cost of collection actions. All other things being equal, jewelry may be retained as exempt personalty as long as its value will not force the total of personalty retained above the appropriate cap.[12]

This is not to say, of course, that market value has no relevance at all, however. The value of a piece may assist the court in answering the more critical questions

---

**10.** *Peters* contains an extensive discussion of the history of the jewelry exemption in Texas case law.

**11.** I do not subscribe to the notion that "comfort and convenience" are particularly meaningful criteria for use in the jewelry exemption area. There are few items of jewelry that contribute to a debtor's comfort (perhaps a belt?), and only watches seem to qualify as a convenience. "Usual and appropriate" are more useful terms, however. Perhaps a more precise way to put it is to talk about items which are "usual and appropriate as wearing apparel." A woman's genuine pearl earrings might thus be held to be exempt, but the gold coin mounted as a necklace might not be.

**12.** The statute sets the dollar cap in terms of the "market value" of personalty claimed. A discussion of what "market value" means in this statute is beyond the scope of this decision. As a practical matter, however, the market value of some jewelry items may render their retention impractical. A debtor may be forced to give up furniture, clothing, and car just to keep her six-carat diamond ring.

about intended purpose for acquisition and retention. Interestingly, the value of a particular piece might be so great that it is too expensive to wear—thereby depriving it of the predicate characteristic for exemption, namely, that it is used as clothing.

## NUMBER OF JEWELRY PIECES

("A Watch Around the Wrist Is Worth Two In The Safety Deposit Box," or "Don't Count Your Bracelets Before They Latch")

The Texas Supreme Court in *Hickman v. Hickman,* 149 Tex. 439, 234 S.W.2d 410, 414 rejected the argument that a debtor may claim only one ring as exempt. The court explained that, if such an argument were true, then "a debtor can claim only one shirt exempt as wearing apparel." However, this does not mean that there are no limits to the number of jewelry pieces a debtor may claim. A limit on the number of items which can be retained is not a concept foreign to the exemption laws of this state. *Cf. Bell v. Franklin,* 230 S.W. 181, 184 (Tex.Civ.App.—San Antonio 1921, no writ) (debtor may have only one homestead); *accord, Silvers v. Welch,* 127 Tex. 58, 91 S.W.2d 686, 687 (Tex.Com.App.1936); *Panhandle Const. Co. v. Continental Southland Sav. & Loan Ass'n,* 110 S.W.2d 632, 634 (Tex.Civ.App.—Amarillo 1938, writ dism w.o.j.); *see also* Tex.Prop.Code, §§ 42.002((3)(D) (two firearms), 42.002(4) (any two from a list of vehicles used for travel); 42.002(5) (specified numbers of farm animals). Reasonable necessity imposes an implicit limit on the number of items that can be retained where no explicit limitation is set out.

It is probable that most debtors possess more than one piece of jewelry that otherwise qualify for exemption. But it is also probable that the more items a debtor possesses, the less likely the other qualifying factors will be present, and the more likely

the pieces are held for investment. For instance, the more items of jewelry a debtor possesses, the more difficult it may be to demonstrate both use and sentimental attachment. In all events, one set of earrings may be reasonably necessary, but fifteen are probably not.[13] It suffices to say that a court must closely scrutinize the number of jewelry pieces so that a debtor does not abuse the exemption.

## DEBTOR'S STATION IN LIFE

("Born on the Wrong Side of the Exemptions?")

I do not believe that a debtor's station in life should serve as justification for treating a jewelry piece as exempt. "Station in life" was one of the factors listed in *In re Tyler,* the bankruptcy decision whose standards the Fifth Circuit *declined* to adopt in *Fernandez.* The "factor" is really a euphemism for a debtor's pre-bankruptcy economic and social class. Stratification of debtors along such lines should be anathema to a court sitting in equity.

The perpetuation of social stratification is also, in this court's view, inconsistent with the public policy sought to be promoted by the exemption statutes of this state, and is fundamentally inconsistent with the history of this state and the circumstances which surrounded the creation of its original constitution. *See,* e.g., Constitution of the Republic of Texas [1836], General Provisions, Sec. 10 ("every head of a family shall be entitled to one league and labor of land"); *id.,* Declaration of Rights ("no title of nobility, hereditary privileges or honors, shall ever be granted or conferred in this Republic"). Through their exemption laws, the founding Texans sought in general to retain "the feeling of freedom and sense of independence which was deemed necessary to the continued existence of democratic institutions." Tex. Const., Art. XVI, § 50,

---

13. A debtor's profession may affect the number of jewelry items reasonably necessary to be retained. A court might find, for example, that it is useful and appropriate for a real estate broker to have four or five necklaces, while a nurse might only need one simple chain. A debtor's station in life, however, as discussed *infra,* should not enter into this analysis. We all know that Imelda Marcos did not need all of those shoes, even if she was the wife of the president of her country.

Interpretive Commentary (Vernon 1955).[14] Exemption laws for personalty work to preserve a minimum standard of dignity for all, regardless who they are. Tex. Const., Art. XVI, § 49, Interpretive Commentary (Vernon 1955). A single exemption statute is thus written in an attempt to set out in one place what the legislature of this state believes to be the definitive list of personality that any Texan should be entitled to retain in furtherance of the foregoing policy. Texas exemption law betrays not an elitist but an egalitarian and democratic outlook.

The Fifth Circuit seems to have acknowledged in *Fernandez* that station in life is a suspect variable, commenting that "[t]he Fernandez' claim of over $8,000 worth of exempt jewelry may well be excessive." *Fernandez*, 855 F.2d at 221. Another bankruptcy court has opined that debtors "should not be allowed to continue in the lifestyle that drove them to file bankruptcy and at the expense of their creditors." *In re Sutliff*, 79 B.R. 151, 157 (Bankr.N.D.N. Y.1987); *see also In re Hendrick*, 45 B.R. 965, 972 (Bankr.M.D.La.1985) (an item does not qualify under a Louisiana exemption law when it is "solely designed to enhance the prestige or status of its owner").

Exemption laws set a base for all citizens, regardless of station in life. They do not assure the preservation of one's pre-filing station if life, nor should they. Debtors' ability to keep their jewelry beyond the reach of creditors must thus be determined by characteristics other than station in life.

### DEBTOR'S CAREER

("Debtors Can't Be Choosers" or "Putting the Cartier Before the Horse")

The debtor argues that a court should give weight to the debtor's career in evaluating entitlement to the exemption. In *Fernandez*, for example, the debtor was a jeweler. His customers would expect him to wear the raiments of his profession, much like a lawyer's suit or a doctor's stethoscope. To deny him of his jewelry, goes the argument, is to deny him of his livelihood.

I find that debtor's argument both inappropriate and irrelevant under the clothing exemption. The genesis of the debtor's thesis is not in the clothing exemption at all but in the "tools of the trade" exemption category, under which a debtor may exempt reasonably necessary "tools, equipment, books, and apparatus, including a boat, used in a trade or profession." Tex. Prop.Code, § 42.002(3)(B); *see* discussion *infra*, Part III. The debtor seeks to extend the tools of the trade logic to all sorts of other items which, though not tools, could arguably be considered to be (1) reasonably necessary and (2) used in a trade or profession.

The debtor's argument is first of all logically flawed insofar as debtor seeks to apply it to jewelry. Texas could have added the "used in a trade or profession" language to the clothing category of exempt property (under which jewelry is said to fall), assuring the result debtor seeks. However, both tools of the trade and clothing are subcategories under the "reasonably necessary" rubric of Section 42.002(3) of the statute. There is no mention of trade or profession in regard to the clothing subcategory. That the reference to trade or profession was included in one subcategory and not the other cannot be lightly overlooked. By the same token, clothing could have been included in the subcategory reserved for tools of the trade. That grouping already includes tools, equipment, apparatus, and books. It even includes a boat. Again, it would be folly to ignore the obvious exclusion of clothing, given its inclusion as a separate category immediately below the tools of the trade category. As jewelry is exempt only because and to the extent it is clothing, it cannot enjoy a separate life as "tools,

---

**14.** In Texas, exemptions for personalty predate the state's admission into the Union, and have as their source not the English common law (which did not contain provision for exemptions), but the civil code first of Spain and later of the Republic of Mexico. Texas' first exemption laws were enacted just three years after it became a republic and some six years before it became a state. Tex. Const., Art. XVI, § 49, Interpretive Commentary (Vernon 1955).

equipment, or apparatus" and gain exemption thereby.

The thesis has already been rejected in Texas in any event. In *Smith v. Horton*, 19 Tex.Civ.App. 28, 46 S.W. 401 (1898, writ ref, 92 Tex. 21, 46 S.W. 627), an architect argued that his bicycle should be exempt under the "tools" exemption. The court rejected the debtor's contentions that "to be deprived of his bicycle placed him at a disadvantage in the pursuit of his occupation, and deprived him of a cheap and expeditious means of of rapid locomotion, which is necessary, and almost indispensable, for the proper and successful pursuit of his business." *Id.* 46 S.W. at 401. The court explained:

> It may be, and doubtless is, quite a useful and convenient mode of locomotion; but being such does not constitute it a 'tool' or 'apparatus' belonging to that trade or profession. If it could be so held, then by the force of the same logic a bicycle could be held to belong to every known trade and profession where means for locomotion is useful and convenient in that trade or profession. Being useful and convenient is not the criterion by which the exemption of property is determined. While the statute does not enumerate what belongs to any particular trade or profession, but leaves it for judicial determination, still it is definite enough to include only such tools and apparatus as properly belonging thereto, and are essential to the conducting of the business.... It does not necessarily include every convenience that might be beneficial in carrying on a particular business. If so, the physician could claim the bicycle as exempt, because it would be useful to him in visiting his patients, the same of the traveling salesman, because he could use it in going from place to place to vend his wares; and so of many of other trades and professions. But it would be doing violence to the facts to say that it was a tool or apparatus that belongs to either of these callings.

*Smith v. Horton*, 46 S.W. at 402; *see In re Weiss*, 92 B.R. 677 (Bankr.N.D.Tex.1988) (discussed *infra*). Thus, the debtor's jewelry is not and should not be exempt as "tools."

A court would not be remiss, on the other hand, in taking the debtor's profession into account for purposes of measuring whether the particular item is reasonably necessary *as clothing*. Just as a lawyer needs suits and ties, so might a real estate broker need earrings and necklaces. Seldom is an item of jewelry ever going to be *necessary* in one's profession, but it may prove "reasonably necessary," i.e., usual and customary, appropriate to the retention of one's dignity. If the line may be drawn anywhere, it is at the point where a debtor contends that he or she must maintain a certain station in life in order to work in one's chosen profession. This court emphatically rejects the notion that a Rolex on the wrist is reasonably necessary to be properly attired for sales calls on investors.

## SUMMARY OF FACTORS USED IN JEWELRY EXEMPTION

■ Borrowing on the foregoing analysis, this court humbly offers the following as a list of characteristics or variables a court might use in deciding the jewelry exemption question. The values assigned each variable must of necessity be fact-specific. Although no one variable controls, certain characteristics must be very prominent relative to other characteristics in order to conform to the "reasonably necessary" test. Of course, the list does not purport to be exhaustive.

1. Debtors must, have actually worn the jewelry item in question with sufficient regularity. to indicate its actual use as clothing. An item need not be worn continuously, though infrequency of wear will tend to undermine this all-important predicate factor to exemption. A court will no doubt greet sudden recent wear with the credulous reception it deserves.

2. Debtors must have, in good faith, intended to use their jewelry as clothing, keeping in mind that, when

jewelry is used as clothing, it does not so much clothe as it adorns and ornaments.

3. Debtors may only retain so much jewelry as is reasonably necessary. In the context of jewelry, "necessary" more logically means "appropriate." In testing reasonable necessity, a court must be sensitive to whether the debtor's retention of the item offends the sensibilities, whether its retention is consistent or inconsistent with the overriding egalitarian nature and function of the exemption laws, and whether retention promotes or impedes public policy, i.e., does the item in question fall within the penumbra of protection intended by the legislature. Other factors listed below may assist the court in divining whether an item is reasonably necessary.

4. Debtors cannot exempt jewelry that has been bought or acquired largely for an investment or resale purpose. Divining such an intent will prove to be one of the more elusive tasks imposed on a finder of fact. In a sense, all of the factors discussed in this decision will shed light on the question. The mere presence of an investment intent mixed with other legitimate intentions is not fatal to the exemption, however.

5. Of paramount importance is the sentimental value which a debtor attaches (or is presumed to have attached, in the case of items such as wedding rings and engagement rings) pre-bankruptcy to a jewelry piece. Measuring sentiment is about like sensing statistics, but most judges should have some feel for when a loss of dignity is likely to result from the concomitant loss of the jewelry.

6. Jewelry can qualify for exemption notwithstanding its luxurious or ornamental character. However, this quality does not automatically render jewelry exempt.

7. Market value is largely, but not absolutely irrelevant as long as the total market value of all personalty claimed falls below the statutory cap. Value may tend to prove an investment intent. Also, an extraordinarily valuable item may be more difficult to establish as "reasonably necessary," as that term is used in this decision.

8. A debtor may only exempt a reasonable number of jewelry pieces, because the larger the number, the less likely all the pieces sought to be retained are "reasonably necessary." What a debtor does for a living may have some bearing on this issue.

9. A debtor's station in life is not generally relevant to this analysis. What a debtor does for a living may be relevant to whether a given item of jewelry is reasonably necessary as clothing, but not the extent that it in turn relies on establishing one's station in life as a purported component of carrying out one's profession.

10. Finally, the task of divining what falls within the protective penumbra of the Texas exemption statutes must be aided by equity, with a view to indulging

the liberality suggested by Texas case law in this area to achieve the purpose of protecting the family from destitution (and embarrassment). *Malone v. Kennedy*, 272 S.W. 509 (Tex.Civ.App.—Beaumont 1925, no writ). It is appropriate therefore to borrow on the "totality of the circumstances" phrase commonly employed in chapter 13 bankruptcy cases in testing the "good faith" of a proposed chapter 13 plan. *See Matter of Chaffin*, 836 F.2d 215, 216 (5th Cir.1988).

The debtor in this case testified that he purchased the three pieces of jewelry, consisting of a Rolex watch, a diamond "pinkie" ring, and a gold bracelet, in 1974. The acquisition of these pieces was a goal of his younger years because he grew up poor. Thus, these self-given gifts were

acquired to flaunt his newly-acquired station in life. They were status symbols which today serve, in his words, to "betray the image I've lived for the last 20 years." Although the debtor testified that he did not purchase them for an investment purpose, he did admit that he used them mostly at formal and social functions to impress individuals with whom he did business. The debtor was not wearing his Rolex when he testified in court, certainly a place as secure and safe as any deposit box, but was wearing another watch.

I find that the debtor did in fact wear the three items of jewelry, and had done so for a number of years. I further find that he intended to use the Rolex watch as wearing apparel. I do not find a particular sentimental attachment which the law could or should recognize for any of these pieces, nor do I find the debtor's station in life to be of any relevance. I find the diamond "pinkie" ring and the bracelet to have been acquired and retained principally to demonstrate his having achieved a certain level of wealth to which he had long aspired. I do not find that to be a purpose within the protective policies of the exemption statutes, nor do I find that the debtor's dignity would be threatened by the loss of either the ring or the bracelet (or both of them). Recalling again the basic function of the exemption statute to afford the debtor a means of support, coupled with a preservation of a semblance of dignity, and recalling as well the admonishment to permit exemption only for items which are reasonably necessary, then viewing all of the factors in their totality, I find that the debtor may retain the Rolex as an item of clothing, but not the bracelet or pinkie ring, neither of which survive the "reasonable necessity" test.

## II. AMOUNT OF PERSONAL PROPERTY EXEMPTION AVAILABLE TO DEBTOR

■ The debtor argues that his relationship with Ms. Brenda King and her teenage son qualifies the debtor for the personal property exemption applicable to a family. A family may exempt $30,000 in personal property. Tex.Prop.Code § 42.001(a). The trustee retorts that the debtor qualifies for only the $15,000 personal property exemption allowed single adults. Tex.Prop.Code § 42.001(b).

Texas recognizes that persons in common-law marriages may qualify as a family for personal property exemptions. *Baker v. Mays & Mays*, 199 S.W.2d 279, 284 (Tex. Civ.App.—Ft. Worth 1946, writ dism w.o.j.). The essential elements of a common-law marriage under Texas law are (1) an express or implied agreement by parties to enter into a marriage, (2) their cohabitation as husband and wife, and (3) their holding of themselves out to the public as being married. *Conlon v. Heckler*, 719 F.2d 788, 792 (5th Cir.1983); *Hinojos v. Railroad Retirement Bd.*, 323 F.2d 227, 230 (5th Cir.1963); *Claveria's Estate v. Claveria*, 615 S.W.2d 164, 166 (Tex.1981); *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978); *Humphreys v. Humphreys*, 364 S.W.2d 177, 178 (Tex.1963).

The first two elements are clearly met in this case. Ms. King has cohabitated with the debtor and has been engaged since March 1984. Although they have never set an exact date for their marriage ceremony, they did ceremonialize this agreement when the debtor made the marriage proposal, gave Ms. King an engagement ring, and Ms. King accepted the offer and the ring. They have lived together ever since and have intended on following through with a formal wedding ceremony during a suitable December month in Hawaii. They have only been unable to consummate this intention because of the debtor's financial straits.

Did the couple hold each other out to the public as being married? The Supreme Court of Texas in *Grisby v. Reib*, 105 Tex. 597, 153 S.W. 1124 (1913) clarified the "holding-out" standard:

> The cohabitation must be professedly as husband and wife, and public, so that, by their conduct towards each other, they may be known as husband and wife.

*Grisby v. Reib*, 153 S.W. at 1130. The court in *Ex parte Threet*, 160 Tex. 482, 333 S.W.2d 361 (1960), warned that "isolated

references to a person as being one's spouse constitutes no evidence of holding out to the public." *Id.* 333 S.W.2d at 364. In *Threet,* the couple never occupied a common residence. On some occasions she introduced the man as her husband, while on others she told people she was single. Noted another case, "[t]he occasional use of the reference 'wife' or 'husband' cannot support a finding of a holding-out, especially in the circumstances where the couple were not sure they were divorced from a previous marriage and had been twice married before." *Gary v. Gary,* 490 S.W. 2d 929, 934 (Tex.Civ.App.—Tyler 1973, writ ref'd n.r.e.). In *Persons v. Persons,* 666 S.W.2d 560 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), although a couple had lived together for a mere four months, they still qualified for common law status, that court noting that the woman's reference to herself as the man's spouse on a credit application was more than a mere "isolated reference" (the standard in *Threet, supra*) because the falsification of the credit application would have exposed the couple to criminal penalties.

One of the better cases addressing the "holding out" requirement (and finding that a common-law marriage existed) is *Matter of Estate of Giessel,* 734 S.W.2d 27 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). Although there was a plethora of testimony from co-workers and neighbors indicating that they thought the couple to be married, this perception was neither uniform nor predominant. In the twenty years they had lived together, neither had told family members that they were married (although they did tell others they were married). In fact, he told his family that he was not married, and that he would never marry the woman. The woman represented in tax returns and other documents (including driver's license, bank account, social security card, and pay check) that she was single. Likewise, the man executed several documents, and even signed Christmas cards, which clearly indicated that he was single. Still, the court concluded that these acts did not preclude finding of a common-law marriage, but went only to the weight of the evidence.

The court rejected the argument that "as a matter of law, no agreement to be married can be inferred from cohabitation and representations ... because there is direct evidence that [the couple] did not always represent themselves to be married." Instead, the court said that the issue should be "whether there was evidence that the agreement was invalid as a matter of law, not whether there was some evidence that the parties did not always represent themselves to be married." *Id.* at 31; *accord Carson v. Kee,* 677 S.W.2d 283 (Tex.App.— Fort Worth [2d Dist.] 1984, no writ) (common-law marriage found despite conflicting evidence on whether the couple represented each other as being married to friends or business associates); *In re Glasco,* 619 S.W.2d 567, 571 (Tex.Civ.App.—San Antonio 1981, no writ) (holding out may be established on preponderance of evidence). Another court has explained:

> In order to prove the validity of the common-law marriage, it is not necessary to offer evidence of husband and wife introductions to the general public. Proof of the holding out to the general public can be shown by other evidence, including the conduct and the actions of the parties, which sometimes speak louder than words of introduction.

*Rosales v. Rosales,* 377 S.W.2d 661, 664 (Tex.Civ.App.—Corpus Christi 1964, no writ). That court found a common-law marriage even though the man testified that he had never introduced the woman as his wife.

Even in the absence of affirmative community recognition of the couple as married, a common law marriage may nonetheless be found.

> Where a man and woman are openly living together in the same house an absence of discussion [by the community] of their marital status would, in itself, indicate an acceptance of them in the community as husband and wife.

*Shelton v. Belknap,* 155 Tex. 37, 282 S.W. 2d 682, 686 (1955). This view is echoed in *Brooks v. Hancock,* 256 S.W. 296 (Tex.Civ. App.—Texarkana 1923, no writ):

Recognition of parties as husband and wife by neighbors is not essential to constitute a valid common-law marriage; it is only a circumstance to be weighed with others. Nor does the absence of such popular recognition, or reputation, furnish conclusive evidence that the contract upon which common-law marriages are based did not in fact exist.

*Id.* at 296.

Neither the debtor nor the trustee introduced evidence as to whether this couple were perceived by family or the community as being married. Similarly, no evidence was introduced on whether the couple represented themselves out to the world, verbally or in documents, that they were married. Still, these gaps do not preclude a finding of a common law marriage. By the same token, the debtor and Ms. King have lived together for nearly five years. The unrefuted testimony of the couple demonstrates beyond a preponderance that their cohabitation of over an extended period attained the status of a common law marriage. They testified that they were in a mutually supportive relationship the equivalent of a marriage. Ms. King described herself as a "home maker." She cooked, cleaned, shopped, and generally kept house for the four people living at the debtor's house, which included the debtor's mother. She also assisted to an unspecified extent the debtor in his businesses. The debtor testified that he provided economic and emotional support to Ms. King and to her teenage son, a son which lived with them for almost the entire four-year period. He considered the boy to be his stepson.

Thus, I find that the debtor is a family unit, qualifying for the $30,000 in personal property exemptions allowed a family unit under the Texas Property Code. Tex.Prop. Code, § 42.001.

## III. INSURANCE PROCEEDS FOR STOLEN ITEMS OF PERSONAL PROPERTY

The debtor claims his portable phone and hand-held recorder were "tools of the trade," or alternatively as household furnishings, rendering the insurance proceeds paid as a result of their theft exempt. Texas case law extends the personal property exemption to the insurance proceeds paid upon the loss of an item otherwise exempt under the statute. *Mosley v. Stratton*, 203 S.W. 397, 398 (Tex.Civ.App.—Austin 1918, no writ), *Willis v. Schoelman*, 206 S.W.2d 283, 284 (Tex.Civ.App.—Galveston 1947, no writ). The issue is thus whether the insured items in question may qualify either as tools of the trade or as household furnishings.

I do not believe that either the portable phone or the hand-held recorder are household furnishings. The purpose of the exemption is to pick up the sorts of items one might furnish one's house with. The hand-held recorder clearly does not qualify. The mobile phone may be a telephone, but its very portability suggests it was designed to accompany the debtor, not the house in which the debtor lives. By the same token, the items superficially seem to qualify under the tools of the trade exception. The precise wording of the statute is "tools, equipment, books and apparatus ... used in a trade or profession." Tex.Prop. Code, § 42.002(3)(B). I fully acknowledge the time-honored shibboleth that the exemption laws of this state are to be construed liberally in favor of the debtor. At the same time, however, I note that numerous cases in Texas have restricted an overbroad application of that rule of construction in this particular exemption category. *See, e.g., Smith v. Horton*, 19 Tex.Civ.App. 28, 46 S.W. 401 (1898), writ ref, 46 S.W. 627 (1898) (architect could not exempt his bicycle); *Cates v. McClure*, 27 Tex.Civ.App. 459, 66 S.W. 224 (1901, writ. ref.) (insurance agent forbade from exempting his harness and buggy); *Massie v. Atchley*, 28 Tex.Civ.App. 114, 66 S.W. 582 (1902) (doctor not allowed to claim his typewriter). The *Massie* court reasoned that

[c]orrespondence and advertising are not acts that constitute a part of the practice of healing diseases and prescribing remedies, and a typewriter used for the purpose of correspondence and advertising is not a tool or apparatus belonging to the profession or practice of medicine, in contemplation of the statute. A physi-

cian has a legal right to use it for that purpose if he pleases, yet the fact that he does so, and that it is a convenience, does not thereby make it a tool or apparatus belonging to that profession. To make a tool or apparatus exempt, it must be shown to belong to a trade or profession pursued by the party claiming the exemption.

*Massie v. Atchley*, 66 S.W. at 583.

No doubt these items are useful to the debtor. They are not, in my view, tools of the trade as that concept is applied in Texas. As Bankruptcy Judge Akard, of the Northern District of Texas recently commented, "[t]he exemption does not cover everything that is useful in a business but only items that are peculiarly adapted to a trade or profession." *In re Weiss*, 92 B.R. 677, 679 (Bankr.N.D.Tex.1988), citing *Macmillan v. Dean*, 174 S.W.2d 737, 739 (Tex. Civ.App.—Austin 1943, writ ref'd w.o.m.) and *Segraves v. Weitzel*, 734 S.W.2d 773 (Tex.App.—Fort Worth 1987, no writ). For this reason, the exemption in the insurance proceeds for the portable telephone and the hand-held recorder will be denied.

The Trustee is directed to prepare a form of order consistent with this decision.